IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRIANNE BRIDGETT HUEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 12-44 |
| v. | ) |
| | ) Judge Nora Barry Fischer |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

I. **INTRODUCTION**

Brianne Bridgett Huey ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 9, 11). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff applied[1] for DIB on June 14, 2010, and SSI on June 12, 2010, claiming a disability onset of September 26, 2009. (R. at 137 – 49). Her claimed inability to work full-time allegedly stems from a number of mental impairments including anxiety disorder, depression, post-traumatic stress disorder ("PTSD"), obsessive compulsive disorder ("OCD"), and bipolar disorder. (R. at 165). Plaintiff was initially denied benefits on July 28, 2010. (R. at 77 – 86). A hearing was scheduled for May 24, 2011, and Plaintiff appeared to testify, represented by counsel. (R. at 27 – 60). A vocational expert also testified. (R. at 27 – 60). The Administrative Law Judge ("ALJ") issued her decision denying benefits to Plaintiff on June 10, 2011. (R. at 9 – 26). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on December 2, 2011, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5).

Plaintiff filed her Complaint in this court on January 12, 2012. (ECF No. 3). Defendant filed his Answer on March 23, 2012. (ECF No. 6). Cross motions for summary judgment followed. (ECF Nos. 9, 11).

---

[1] Plaintiff previously filed for DIB and SSI on August 31, 2007, claiming a disability onset of February 25, 2007. (ECF No. 7 at 64 (Citations to ECF Nos. 7 – 7-9, the Record, *hereinafter*, "R. at __")). Plaintiff's claim was denied in a decision dated September 25, 2009. (R. at 61). There is no record of a request for review by the Appeals Council or of the filing of a complaint in the United States District Court following the denial. Plaintiff did not wish to re-open the matter. (R. at 32). Plaintiff amended her alleged disability onset date to September 26, 2009 at her administrative hearing. (R. at 32).

**III. STATEMENT OF FACTS**

    A. <u>General Background</u>

Plaintiff was born April 2, 1979 and was thirty two[2] years of age at the time of her administrative hearing. (R. at 32). Plaintiff resided with her husband, to whom she had recently been married on October 31, 2010. (R. at 32). Plaintiff's sole source of income was her husband's Social Security disability benefits. (R. at 33). Plaintiff graduated from high school, and completed approximately one year of college in furtherance of a degree in Psychology. (R. at 33 – 36). Plaintiff last worked for two days in April 2010. (R. at 33 – 36). She had made no attempts to find work following that time. (R. at 33 – 36). Her last full-time position was as a stockperson/cashier for Wal-Mart in 2004 – 2005. (R. at 33 – 36).

In her own self-report dated June 23, 2010, Plaintiff claimed that she was unable to work due to bipolar disorder, anxiety, OCD, depression, and panic. (R. at 193). Sometimes Plaintiff's sleep was disturbed. (R. at 187). She complained that personal care tasks such as dressing and bathing caused her anxiety, and she had to force herself to complete these tasks on a regular basis. (R. at 187). Plaintiff felt unable to multi-task or concentrate. (R. at 188, 191). She avoided being around others. (R. at 191). Stressful situations allegedly caused panic attacks. (R. at 192).

Plaintiff spent most of her day reading, watching television, and occasionally going to the library. (R. at 186). She would take a walk outside approximately once a week, independently. (R. at 189). Plaintiff went grocery shopping once a week for two hours. (R. at 189). She was capable of occasionally washing dishes. (R. at 188). Plaintiff paid bills, could count change, and could use money orders, but claimed that she was incapable of keeping track of her account balances. (R. at 189).

---

[2]    Plaintiff is defined as a, "Younger Person." 20 C.F.R. §§ 404.1563, 416.963.

B. <u>Medical History</u>

On February 18, 2009, Plaintiff visited a family health clinic at Latrobe Hospital in Latrobe, Pennsylvania. (R. at 213). She complained of anxiety, mood swings, and depression. (R. at 213). She was diagnosed with depression, anxiety, and PTSD. (R. at 213). She was provided with prescription Klonopin[3] and Celexa[4]. (R. at 213).

Plaintiff received psychiatric care at Southwestern Pennsylvania Human Services ("SPHS") beginning in August 2009 and ending in January 2010. In an initial assessment, Plaintiff was noted to complain of depression, anxiety, and OCD. (R. at 231 – 39). Plaintiff further complained of low energy, poor sleep, irritable mood, significant worry and anxiety, panic attacks, mood swings, low self-esteem, difficulty with concentration and memory, racing thoughts, poor decision making, hallucinations, and paranoia. (R. at 231 – 39). Plaintiff claimed that she experienced suicidal ideation for years, and had attempted suicide on multiple occasions. (R. at 231 – 39). She also endorsed anger to the point of feeling homicidal. (R. at 231 – 39).

SPHS staff observed that Plaintiff had a normal appearance, normal thought content/process, no hallucinations, normal cognition, no delusions, normal affect, normal mood, normal orientation, and normal memory. (R. at 231 – 39). Plaintiff was noted to have an upcoming mental health disability hearing, and that she had both a legal and personal interest in engaging in therapy. (R. at 229). However, Plaintiff's complaints appeared to SPHS staff to be

---

[3] Clonazepam, also referred to as "Klonopin," is used alone or in combination with other medications to control certain types of seizures and panic attacks. It is in a class of medications known as benzodiazepines, and decreases abnormal electrical activity in the brain. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000635/ (last visited May 22, 2012).

[4] Citalopram, also referred to as "Celexa," is used to treat depression, and is thought to work by increasing the amount of serotonin – a natural substance in the brain that helps maintain mental balance. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001041/ (last visited May 22, 2012).

genuine. (R. at 230). Plaintiff reported that she felt that she would improve with medication and counseling. (R. at 229 – 30).

Plaintiff was evaluated by a physician at SPHS on October 29, 2009. (R. at 223 – 225). The physician recorded Plaintiff's complaints of depression, anxiety, and OCD. (R. at 223 – 225). Plaintiff's history of mental illness, however, was described as vague. (R. at 223 – 225). Plaintiff appeared calmer and more relaxed than her complaints would suggest, she was not in distress, and did not exhibit any symptoms of depression or anxiety. (R. at 223 – 225). She had no suicidal or homicidal ideation. (R. at 223 – 225). Plaintiff's perceptions were normal. (R. at 223 – 225). Her thought processes were ingrained, and her insight was limited. (R. at 223 – 225). Plaintiff was ultimately diagnosed with anxiety disorder, OCD, and bipolar disorder. (R. at 223 – 225). She was assessed a global assessment of functioning[5] ("GAF") score of 60. (R. at 223 – 225).

Plaintiff only appeared for two medication checks at SPHS. (R. at 221 – 22). On those occasions, Plaintiff was generally observed to be clean, pleasant, and well-dressed. (R. at 221 –

---

[5] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

22). Her cognition was fair, she had some anxiety, and she had some insight. (R. at 221 – 22). Her speech was organized. (R. at 221 – 22). She endorsed little or no suicidal ideation, and had no plan. (R. at 221 – 22). Plaintiff was discharged from SPHS on or about January 12, 2010 due to relocation. (R. at 226 – 28). Her GAF score at the time was 59. (R. at 221 – 22). She had only managed modest improvement in symptoms after eleven therapy sessions. (R. at 221 – 22). Her prognosis was termed "fair," and she was expected to improve with further therapy. (R. at 221 – 22).

On January 13, 2010, Plaintiff presented at Westmoreland Hospital in Greensburg, Pennsylvania with complaints of vomiting and diarrhea. (R. at 300 – 09). Plaintiff was treated and released. (R. at 300 – 09). Her mental health history was noted, but her mood and affect were normal at the time. (R. at 300 – 09). Plaintiff reappeared on January 16, 2010 for the same complaints. (R. at 294 – 99). She was treated and released, with no noted neurological deficits. (R. at 294 – 99).

Plaintiff was seen again in the emergency department of Westmoreland Hospital on May 6, 2010. (R. at 243 – 49, 285 – 93). Plaintiff complained of chronic, worsening suicidal ideation, and allegedly planned to slit her wrists. (R. at 243 – 49, 285 – 93). Plaintiff's history of anxiety, depression, bipolar disorder, and OCD were noted. (R. at 243 – 49, 285 – 93). She appeared anxious. (R. at 243 – 49, 285 – 93). She had no neurological issues. (R. at 243 – 49, 285 – 93). Plaintiff was thereafter admitted to the hospital, where she remained until May 10, 2010. (R. at 243 – 49, 285 – 93).

While in the hospital, Plaintiff revealed that she was in the midst of significant financial strain, could not hold a job, was hopeless, and wanted to die. (R. at 243 – 49, 285 – 93). She reported having had a long history of on-and-off mental health treatment with Joel Last, M.D.

(R. at 243 – 49, 285 – 93). Plaintiff was tearful and upset, and exhibited very limited insight and judgment. (R. at 243 – 49, 285 – 93). She was diagnosed with major depressive disorder. (R. at 243 – 49, 285 – 93). She was assessed a GAF score of 30. (R. at 243 – 49, 285 – 93). Plaintiff was prescribed Neurontin[6], Klonopin, Anafranil[7], and Prozac[8]. (R. at 243 – 49, 285 – 93). By the time of discharge, Plaintiff's mood was stable, she denied suicidal or homicidal ideation, and agreed to follow up with Dr. Last. (R. at 243 – 49, 285 – 93). She was assessed a GAF score of 50. (R. at 243 – 49, 285 – 93).

On May 13, 2010, Dr. Last summarized approximately eight months of Plaintiff's treatment. (R. at 255 – 60). Plaintiff was diagnosed with bipolar disorder, OCD, and anxiety. (R. at 255 – 60). Plaintiff was noted to have issues with anxiety attacks. (R. at 255 – 60). Plaintiff's prescription medications included Prozac, Klonopin, Neurontin, and Anafranil. (R. at 255 – 60). Plaintiff's appearance and behavior were recorded as appropriate, her speech was clear and articulate, her mood was depressed, her affect was anxious, her thoughts were coherent and goal oriented, she had no preoccupations, suicidal ideation, delusions, ideas of reference, or abstract thinking, her intelligence was average, her concentration was poor, her memory was intact, her impulse control was good, her judgment was good, and her insight was fair. (R. at 255 – 60). Plaintiff was capable of managing benefits in her own best interests; she

---

[6] Gabapentin, also referred to as "Neurontin," is an anticonvulsant medication used to help control seizures, post-herpetic neuralgia, and restless legs syndrome. It decreases abnormal excitement in the brain, and changes the way the body senses pain. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940/ (last visited May 22, 2012).

[7] Clomipramine, also referred to as "Anafranil," is used to treat people with OCD. It is in a group of medications known as tricyclic antidepressants, and increases the amount of serotonin – a natural substance in the brain that helps maintain mental balance. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000990/ (last visited May 22, 2012).

[8] Fluoxetine, also referred to as "Prozac," is used to treat depression, OCD, some eating disorders, and panic attacks. It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000885/ (last visited May 22, 2012).

demonstrated no difficulty with activities of daily living, social functioning, or concentration, persistence, and pace. (R. at 255 – 60). She suffered no medication side effects. (R. at 255 – 60). Dr. Last's overall prognosis was fair. (R. at 255 – 60). He indicated that Plaintiff would experience no more than slight limitation in all areas of functioning. (R. at 255 – 60).

On July 7, 2010, state agency consultant, Phyllis Brentzel, Psy.D., completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff. (R. at 264 – 67). In it, Dr. Brentzel diagnosed Plaintiff with affective disorders, anxiety-related disorders, and personality disorders. (R. at 264 – 67). Following a review of the medical record, Dr. Brentzel found Plaintiff to be no more than moderately to not significantly limited in all areas of functioning. (R. at 264 – 67). Dr. Brentzel determined that Plaintiff was capable of full-time work, in spite of her impairments. (R. at 264 – 67).

Plaintiff received treatment through Wesley Spectrum Services ("WSS") beginning in June 2010 and ending in May 2011. (R. at 342 – 44). While there, she engaged in individual counseling, and she was provided with prescription medication by psychiatrist, Charles Franchino, M.D. (R. at 342 – 44). In an initial psychiatric evaluation dated July 21, 2010, Plaintiff complained of suffering symptoms caused by bipolar disorder, anxiety, OCD, PTSD, and depression. (R. at 336 – 37). Plaintiff was in the process of divorcing her then-husband. (R. at 336 – 37). Plaintiff was not employed and was seeking Social Security benefits. (R. at 336 – 37). She claimed to have attempted suicide on numerous occasions since the age of twelve, but never followed through due to her religious beliefs. (R. at 336 – 37). She also reported experiencing panic attacks preceded by hallucinations. (R. at 336 – 37). She noted past treatment with Dr. Last and SPHS, and a history of hospitalizations for psychological issues. (R. at 336 – 37).

Upon examination, Plaintiff was observed to be dressed neatly, was cooperative and appropriate, had normal range of affect, euthymic mood, clear sensorium, and normal perception, and she spoke logically. (R. at 336 – 37). Plaintiff was diagnosed with bipolar disorder and anxiety disorder. (R. at 336 – 37). She was assessed a GAF score of 55. (R. at 336 – 37). Plaintiff was prescribed Neurontin, Klonopin, Prozac, and Risperdal[9] to treat her conditions. (R. at 336 – 37).

Plaintiff engaged in routine medication checks at WSS as a part of her therapeutic regimen. She was monitored primarily by Dr. Franchino. Notes from medication checks span August 2010 through May 2011. (R. at 325 – 35). During that time, Plaintiff was consistently noted to experience suicidal ideation. (R. at 325 – 35). However, she was also indicated as unlikely to follow-through due to her religious beliefs. (R. at 325 – 35). Plaintiff had some manic episodes, experienced sadness and depression, and had variable anxiety. (R. at 325 – 35). However, as she continued with her medications, all of her conditions improved. (R. at 325 – 35). She had "mild" to "little" depression, "low grade" suicidal ideation, increased sleep, increasing energy, calm and pleasant demeanor, normal appetite, goal directed thoughts, normal speech, and she increasingly reported feeling better and "doing ok." (R. at 325 – 35). Plaintiff tolerated her medications well, with the exception of some weight gain attributed to Neurontin – the dosage of which was successfully decreased. (R. at 325 – 35).

On March 16, 2011 Plaintiff entered the emergency department at Westmoreland Hospital. (R. at 310 – 24). Plaintiff complained of suicidal ideation and a desire to cut herself. (R. at 310 – 24). Hospital staff noted her history of psychological disorders, including depression, anxiety, and bipolar disorder. (R. at 310 – 24). She reported that her suicidal

---

[9] Risperidone, also referred to as "Risperdal," is an anti-psychotic medication used to treat mental illnesses including schizophrenia, bipolar disorder, and irritability associated with autistic disorder. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000944/ (last visited May 22, 2012).

thoughts began the day before she visited the hospital. (R. at 310 – 24). Plaintiff was found to be depressed, but not anxious or agitated. (R. at 310 – 24). She had no other neurological abnormalities. (R. at 310 – 24). Plaintiff's thought was coherent, her affect was appropriate, cooperative, and attentive, her insight and judgment were normal, she appeared well, and she was in no distress. (R. at 310 – 24). Plaintiff was admitted to the hospital for treatment, and was discharged on March 22, 2011. (R. at 310 – 24). At that time, she was diagnosed with bipolar disorder and OCD. (R. at 310 – 24). She was assessed a GAF score of 35. (R. at 310 – 24). Hospital staff noted that when compliant with medication and engaged in therapy, Plaintiff did well and felt much better. (R. at 310 – 24).

Dr. Franchino completed a Medical Assessment of Ability to do Work-related Activities (Mental) on May 19, 2011. (R. at 338 – 41). He indicated therein that Plaintiff would experience significant functional limitation in the work setting. He also found that Plaintiff had marked limitation carrying out detailed instructions and making judgments on simple work-related decisions. (R. at 338 – 41). Dr. Franchino opined that these findings were evidenced by panic attacks and episodes of decompensation when faced with stressors. (R. at 338 – 41). Plaintiff was also found to have marked limitation interacting appropriately with co-workers and responding appropriately to work pressures in the usual work setting. (R. at 338 – 41). Additionally, he maintained that Plaintiff would experience extreme limitation interacting with the public and supervisors, and responding appropriately to changes in a routine work setting. (R. at 338 – 41). Dr. Franchino asserted that these limitations were evidenced by Plaintiff's failure to "address conflict or areas of concern while in treatment" at WSS. (R. at 340). Dr. Franchino found that Plaintiff would be able to manage benefits in her own best interests. (R. at 338 – 41). Dr. Franchino supplemented his restrictions in July 2011, stating that Plaintiff would

need to avoid nighttime work, because interference with normal sleep patterns would adversely affect her bipolar disorder. (R. at 211).

    C. <u>Administrative Hearing</u>

Plaintiff testified that she initially ceased working in an attempt to complete a degree in psychology. (R. at 33 – 35). Yet, Plaintiff withdrew from college after approximately one year due to alleged anxiety. (R. at 35 – 36). Following that time, she only worked a total of two days. (R. at 33 – 35). She left that job as a result of anxiety. (R. at 34 – 35). She has not attempted to find work since. (R. at 34).

Plaintiff claimed that she was unable to work due to anxiety when pressured, and experienced low energy related to depression, and frequent panic attacks. (R. at 36 – 37). Attempting to complete tasks such as applying for government-subsidized housing apparently triggered crippling anxiety. (R. at 39). Plaintiff also described struggling with suicidal ideation and a sense of hopelessness. (R. at 37 – 38). She stated that she would never kill herself, however, because of her strong moral objection to suicide, and her belief that she would go to hell if she committed suicide. (R. at 40).

Plaintiff described having difficulty with everyday tasks such as bathing and dressing. (R. at 43 – 45). She frequently stayed in bed all day – essentially paralyzed by her anxiety. (R. at 43 – 45). Plaintiff's medications provided her with some relief from her psychological symptoms, but not complete relief. (R. at 45). Plaintiff's anxiety and panic were easily triggered. (R. at 45 – 49).

Following Plaintiff's testimony, the ALJ asked a vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would be eligible for a significant number of jobs in the national economy if limited to simple, routine, repetitive work

at an entry-level, not involving interaction with the public, quotas, keeping pace with a machine, or more than occasional contact with co-workers and supervisors. (R. at 52 – 53). The hypothetical person should work primarily with things, not people. (R. at 53).

The vocational expert responded that such a person would be capable of working as a "night cleaner," with 215,995 positions available in the national economy, as a "laundry sorter" or "folder," with 156, 878 positions, or as a "marker" or "ticketer," with 576,000 positions. (R. at 53). The ALJ followed by changing the hypothetical to work of an unskilled nature, no quotas, no machine pace, no work as part of a team, and a static environment allowing for being off-task for fifteen minutes at a time in an unscheduled manner in addition to regular breaks. (R. at 53).

The vocational expert replied that such a person would be ineligible for full-time work. (R. at 54). Further, the vocational expert explained that being off-task twenty to twenty-five percent of any given work day would preclude full-time employment, as would more than one or two monthly absences from work, frequent tardiness, or frequent early dismissals. (R. at 54 – 55).

## IV. STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When

reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[10], 1383(c)(3)[11]; *Schaudeck v.*

---

[10] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[11] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 90-91 (3d. Cir. 1986).

## V. DISCUSSION

In her decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairments in the way of depression, bipolar disorder, anxiety disorder, and PTSD. (R. at 14).

14

In spite of these impairments, the ALJ determined that Plaintiff was capable of engaging in a full range of work at all exertional levels, but limited to jobs involving only simple, routine, repetitive tasks at an entry level, not performed in a quota based environment or at a machine pace, and requiring no more than occasional contact with co-workers and supervisors, and no contact with the public – Plaintiff should work with things and not people. (R. at 17). Relying upon the testimony of the vocational expert, the ALJ denied Plaintiff benefits because even with such limitations she was eligible for a significant number of jobs in existence in the national economy. (R. at 21 – 22).

Plaintiff objects to the unfavorable determination of the ALJ in allegedly failing to accord proper weight to the functional capacity assessment of Plaintiff's treating physician, Charles Franchino, M.D., the tone of which suggested that Plaintiff was incapable of any substantial gainful employment. (ECF No. 10 at 13 – 15). Plaintiff argues that the ALJ should have adopted the medical conclusions of Dr. Franchino due to significant support within the medical record. (ECF No. 10 at 13 – 15). Defendant counters that inconsistencies within the medical record, and Dr. Franchino's own treatment notes, ultimately undermine his findings of severe functional limitation. (ECF No. 12 at 7 – 10). The ALJ was not, therefore, required to accept Dr. Franchino's assessment.

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F. 2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the reviewing court to determine whether any rejection of potentially pertinent, relevant

evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F. 3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F. 2d at 706). In the present case, had the ALJ adopted the limitations findings of Dr. Franchino, Plaintiff would undoubtedly be considered disabled for purposes of receiving disability benefits. However, in a carefully reasoned discussion, the ALJ explained her rationale for giving Dr. Franchino's functional limitations findings little weight, and thereby met her responsibilities under the law.

It is true that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F. 3d 310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F. 3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F. 2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.*

There is a great deal of contradictory evidence in this record. In cases such as this, involving conflicting medical findings, "the ALJ is not only entitled but required to choose between them." *Cotter*, 642 F. 2d at 705. Here, in this court's estimation the ALJ made the correct choice – to reject Dr. Franchino's ultimate conclusions.

It is significant that Dr. Franchino's own treatment notes never indicated anything approaching the extreme degree of limitation alleged in his functional capacity assessment. (R. at 15 – 16, 18 – 20). In fact, in treatment Dr. Franchino found that Plaintiff had "mild" to "little" depression, "low grade" suicidal ideation and a high unlikelihood of follow-through, increased

sleep, increasing energy, calm and pleasant demeanor, normal appetite, goal directed thoughts, normal speech, and self-reports of improvement in personal well-being. (R. at 325 – 35). Notably, Plaintiff was improving over the course of her treatment. (R. at 15 – 16, 18 – 20). None of the medical records, or Dr. Franchino's own treatment notes, indicated that Plaintiff experienced functional limitation on the order of that expressed by Dr. Franchino in his assessment. (R. at 15 – 16, 18 – 20).

Further, although Plaintiff was twice hospitalized on a voluntary basis, on both occasions she was treated successfully and released. (R. at 16). As pointed out by Defendant in his brief, Dr. Franchino failed to account for hospital reports from Plaintiff's March 2011 admission which indicated that in spite of Plaintiff's allegations of suicidal ideation, her thoughts were coherent, her affect was appropriate, she was cooperative, she was attentive, her insight and judgment were normal, she appeared well, and she was in no distress. (ECF No. 12, at 5 n. 3; R. at 310 – 24). Given the above evidence from the record, it was the ALJ's prerogative to accord Dr. Franchino's assessment only partial weight because a substantial quantity of conflicting evidence contradicted his limitations findings. *See Rutherford v. Barnhart*, 399 F. 3d 546, 554 (3d Cir. 2003) (ALJ's are not required to include every alleged limitation in their hypotheticals and RFC assessments; they must "accurately convey" only "*credibly established limitations*" which "are medically supported and otherwise uncontroverted in the record").

Moreover, in functional assessments completed by both Dr. Last and Dr. Brentzel, Plaintiff was considered – at most – only moderately limited. (R. at 15 – 16, 18 – 20). While the ALJ accorded Dr. Last's assessment little weight, it was not because his findings were not severe enough, but because the findings included some internal inconsistencies and were not sufficiently thorough. (R. at 19). Dr. Brentzel's findings, however, were accorded significant

weight because they were internally consistent, consistent with the medical record, and adequately supported. (R. at 19 – 20). While Dr. Brentzel did not examine Plaintiff, state agency consultants such as Dr. Brentzel are highly qualified, and their opinions are often entitled to receive significant consideration when supported. *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (3d Cir. 2011) (citing SSR 96-6p). In light of the ALJ's thorough discussion of the record and Dr. Franchino's anomalous severe functional capacity assessment, the court finds that substantial evidence supported the ALJ's rejection of Dr. Franchino's opinion in favor of Dr. Brentzel's RFC.

### VI. CONCLUSION

Based upon the foregoing, the decision of the ALJ is adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: June 6, 2012
cc/ecf: All counsel of record.